# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

DEMETRIUS DARDEN,
      Plaintiff,

      v.

ANDREW SAUL, ACTING
COMMISSIONER OF SOCIAL
SECURITY,
      Defendant.

No. 3:19-cv-891 (SRU)

## RULING ON CROSS-MOTIONS FOR JUDGMENT ON THE PLEADINGS

In this Social Security appeal, Demetrius Darden moves to vacate the decision by the

Social Security Administration ("SSA") denying his claim for disability insurance benefits. *See*

Mot. to Reverse, Doc. No. 18. The Commissioner of the Social Security Administration (the

"Commissioner") moves to affirm. *See* Mot. to Affirm, Doc. No. 21. For the reasons that

follow, I **grant** Darden's motion and **deny** the Commissioner's.

## I.	Standard of Review

The SSA follows a five-step process to evaluate disability claims. *Selian v. Astrue*, 708

F.3d 409, 417 (2d Cir. 2013) (per curiam). First, the Commissioner determines whether the

claimant currently engages in "substantial gainful activity." *Greek v. Colvin*, 802 F.3d 370, 373

n.2 (2d Cir. 2015) (per curiam) (citing 20 C.F.R. § 404.1520(b)). Second, if the claimant is not

working, the Commissioner determines whether the claimant has a "'severe' impairment," i.e.,

an impairment that limits his or her ability to do work-related activities (physical or mental). *Id.*

(citing 20 C.F.R. §§ 404.1520(c), 404.1521). Third, if the claimant does have a severe

impairment, the Commissioner determines whether the impairment is considered "per se

disabling" under SSA regulations. *Id.* (citing 20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526). If

the impairment is not per se disabling, then, before proceeding to step four, the Commissioner determines the claimant's "residual functional capacity" based on "all the relevant medical and other evidence of record." *Id.* (citing 20 C.F.R. §§ 404.1520(a)(4), (e), 404.1545(a)). "Residual functional capacity" is defined as "what the claimant can still do despite the limitations imposed by his [or her] impairment." *Id.* Fourth, the Commissioner decides whether the claimant's residual functional capacity allows him or her to return to "past relevant work." *Id.* (citing 20 C.F.R. §§ 404.1520(e), (f), 404.1560(b)). Fifth, if the claimant cannot perform past relevant work, the Commissioner determines, "based on the claimant's residual functional capacity," whether the claimant can do "other work existing in significant numbers in the national economy." *Id.* (citing 20 C.F.R. §§ 404.1520(g), 404.1560(b)). The process is "sequential," meaning that a petitioner will be judged disabled only if he or she satisfies all five criteria. *See id.*

The claimant bears the ultimate burden of proving that he or she was disabled "throughout the period for which benefits are sought," as well as the burden of proof in the first four steps of the inquiry. *Id.* at 374 (citing 20 C.F.R. § 404.1512(a)); *Selian*, 708 F.3d at 418. If the claimant passes the first four steps, however, there is a "limited burden shift" to the Commissioner at step five. *Poupore v. Astrue*, 566 F.3d 303, 306 (2d Cir. 2009) (per curiam). At step five, the Commissioner need only show that "there is work in the national economy that the claimant can do; he need not provide additional evidence of the claimant's residual functional capacity." *Id.*

In reviewing a decision by the Commissioner, I conduct a "plenary review" of the administrative record but do not decide *de novo* whether a claimant is disabled. *Brault v. Soc. Sec. Admin., Comm'r*, 683 F.3d 443, 447 (2d Cir. 2012) (per curiam); *see also Mongeur v.*

*Heckler*, 722 F.2d 1033, 1038 (2d Cir. 1983) (per curiam) ("[T]he reviewing court is required to examine the entire record, including contradictory evidence and evidence from which conflicting inferences can be drawn.").  I may reverse the Commissioner's decision "only if it is based upon legal error or if the factual findings are not supported by substantial evidence in the record as a whole."  *Greek*, 802 F.3d at 374–75.  The "substantial evidence" standard is "very deferential," but it requires "more than a mere scintilla."  *Brault*, 683 F.3d at 447–48.  Rather, substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Greek*, 802 F.3d at 375 (citation omitted).  Unless the Commissioner relied on an incorrect interpretation of the law, "[i]f there is substantial evidence to support the determination, it must be upheld."  *Selian*, 708 F.3d at 417.

## II.     Facts[1]

Darden applied for supplemental security income ("SSI") benefits on November 30, 2015, alleging that he was disabled as of January 1, 2008.  R. at 196.  As set forth more fully below, Darden's application was denied at each level of review.  He now seeks an order vacating the decision and remanding for a new hearing.

### A.  Medical History

Darden's medical problems date back to the 1990s, when he was shot twice in the back and leg and subsequently suffered from various physical and mental ailments.  *See* R. at 448, 564.  The medical records, which span from June 2014 through January 2018, reflect frequent visits to the emergency room, with Darden presenting with symptoms ranging from severe itching to abdominal, back, and foot pain.  *See, e.g*., R. at 331–82.

---

[1] The following facts are drawn primarily from Darden's Statement of Material Facts, doc. no. 20, and from the Commissioner's Statement of Material Facts, doc. no. 21-2.

On December 28, 2015, Darden saw Stephen Opoku, an advanced practice registered nurse ("APRN") at Cornell Scott Hill Health Center ("Hill Health") and reported pain and muscle spasm in his back.  R. at 387–88.  Nurse Opoku examined Darden's mental status as part of his review, and observed that Darden was alert and cooperative, had a normal mood and affect, and had normal attention span and concentration.  R. at 390.  Three months later, on February 16, 2016, Darden was admitted to the emergency room for fever, weakness, and a cough.  R. at 423.  Upon psychiatric review, Darden's behavior and thought content were reported as normal.  R. at 423–25.  Darden was given antibiotics and discharged.  R. at 429.

On March 14, 2016, Darden was seen at the Yale-New Haven Hospital by Dr. Suzannah Luft, M.D., his primary care physician.  R. at 445.  Darden described symptoms of startling easily at loud noises, feeling paranoid and anxious, and having flashbacks and nightmares.  *Id.* On examination, Dr. Luft diagnosed Darden with possible post-traumatic stress disorder ("PTSD") and anxiety with history of heavy alcohol use.  R. at 447.  Dr. Luft referred Darden to a social worker and, because Darden mentioned that he had seen a mental health provider at Hill Health, advised him to make another appointment there.  *See* R. at 434, 445.

On April 28, 2016, Darden returned to Yale-New Haven Hospital.  R. at 448.  He saw Aliza Kreisman, a registered nurse, for his mental health complaints and reported increased suicidal thoughts.  *See id.*  He explained that he has struggled with suicidal thoughts, paranoia, fear, flashbacks, and nightmares since he was shot, and that he is easily distracted and triggered by loud noises, "people in his space," and unexpected movements.  *Id.*  He stated that he is physically able to work, but that he had to leave his prior jobs due to his PTSD symptoms.  *Id.* He also indicated that he was attending group theory at Project Innocence twice a week.[2]  Nurse

---

[2] Those records are not included in the administrative transcript.

Kreisman diagnosed him with PTSD, prescribed Paxil and Prazosin for his depression and nightmares, and referred him to Hill Health for psychotherapy. R. at 449.

At a follow-up visit on May 26, 2016 with Dr. Emily Wang, M.D., Darden reported that his best friend had committed suicide after killing someone, and that he was having trouble sleeping and was experiencing nightmares, flashbacks, and difficultly being in public. R. at 450. He also expressed that he was having occasional suicidal ideation and had been drinking to alleviate his pain. *Id.* He requested an "urgent referral" to Hill Health for his symptoms, which Dr. Wong placed. *Id.* Dr. Wong additionally increased his Prazosin dosage for his PTSD and nightmares. R. at 451.

On June 16, 2016, Darden was seen at Hill Health for an initial assessment and was diagnosed with chronic PTSD. R. at 578, 582. During the evaluation, Darden again reported flashbacks, nightmares, hypervigilance, an exaggerated startle response, paranoia, a mistrust of others, and isolation from others. R. at 579. He also expressed difficulty sleeping, noting that he fears that "someone will come after him in his sleep" and sleeps for only three hours a night. *Id.* He further noted that he occasionally experiences visual hallucinations of shadows and suicidal ideation when stressed. *Id.* A mental status examination indicated that Darden also suffered from a depressed mood, a flat affect, and mildly impaired judgment. R. at 581.

On July 8, 2016, Darden began treatment at Hill Health, where he was evaluated by Dr. Desreen Dudley, Pys.D, and diagnosed with PTSD and major depressive disorder. R. at 563, 576. Darden discussed how he began experiencing anxiety and depression in 2002 following the two shootings. R. at 564. He also reported that he was incarcerated from 2008 to 2014 and for six months in 2015, during which time he witnessed violence and others attempted to rape him. *See id.* According to Darden, his symptoms thereafter exacerbated. *Id.* He confirmed having

thoughts of suicide within the last 48 hours and indicated that the Paxil was not alleviating his symptoms.  R. at 561, 65.

Dr. Dudley observed Darden to be appropriately dressed; have normal attention; have average intellect; be oriented to person, place, and time; have intact memory; have age-appropriate impulse control; have normal speech; have appropriate thought processes; have no perceptual impairment; have good insight and unimpaired judgment; have a depressed and anxious mood; have a restricted affect; and have emotional state symptoms of sadness, depression, irritability, and nervousness.  R. at 567–70.

Five days later, on July 13, 2016, Darden saw Dr. Dudley again for individual therapy. R. at 558.  Darden noted that his symptoms were triggered as a result of the recent Fourth of July celebrations and voiced that he was still not benefitting from Paxil.  *Id*.  Dr. Dudley diagnosed him with chronic PTSD and referred him for a psychiatric evaluation with David Dietrick, APRN.  R. at 559–60.

On August 17, 2016, Darden was seen at Hill Health for a psychiatric evaluation and began medication management with Nurse Dietrick.  R. at 481–84.  Darden reported and exhibited similar symptoms as his initial June 16, 2016 appointment, with the exception that his suicidal ideation had increased and was accompanied by thoughts to drown himself.  R. at 481. According to Nurse Dietrick, Darden was cooperative, engaged, alert, and oriented, and had a euthymic (normal) mood, an appropriate affect, good impulse control, coherent thought processes, logical thought content, intact memory, and average intellect.  R. at 483–84.  Nurse Dietrick prescribed him Ziprasidone, Trazodone, and Prazosin for his PTSD.  R. at 484.

Darden continued to see Nurse Dietrick and Dr. Dudley until he was incarcerated again in March 2017.  Throughout that treatment period, Darden reported and exhibited symptoms similar

to those he presented with during his initial visit. *See, e.g.*, R. at 555 (August 8, 2016); R. at 552–54 (August 23, 2016); R. at 549–51 (August 30, 2016) (also exhibiting illogical thought content and absent insight); R. at 546 (September 6, 2016); R. at 543–55 (October 5, 2016); R. at 540 (October 8, 2016); R. at 537–38 (December 6, 2016) (also exhibiting an unkempt appearance, "overly familiar" appearance, impaired impulse control, anxious preoccupations, absent insight, and moderately impaired judgment); R.at 534–35 (December 16, 2016); R. at 477–80 (December 20, 2016); R. at 531–33 (December 23, 2016) (also exhibiting a disheveled appearance, fair impulse control, absent insight, and moderately impaired judgment); R. at 528 (January 8, 2017); R. at 525–27 (January 10, 2017) (also exhibiting absent insight); R. at 472–76 (January 17, 2017); R. at 522–23 (January 26, 2017); R. at 519–21 (February 2, 2017); R. at 516–18 (February 20, 2017); R. at 513–15 (March 1, 2017); R. at 510–512 (March 7, 2017) (also exhibiting moderately impaired judgment).

On March 10, 2017, while incarcerated, Darden was examined by Sarah Larkin, APRN. R. at 1118.  During his appointment, Darden acknowledged that he had not been fully compliant with his psychiatric treatment plan, explaining that "I don't always take [the medications], they scare me." *Id*.  He denied having hallucinations or delusions, and was observed to be pleasant, calm, and cooperative, and to have an "okay" mood, a euthymic affect, normal speech, and linear thought processes.  R. at 1118, 1121.  Nurse Larkin did not give him a psychiatric diagnosis.  R. at 1118.

On March 13, 2017, Darden was discharged from treatment at Hill Health due to his reincarceration.[3]  R. at 507–09.  His discharge diagnoses included major depressive disorder, PTSD, and mild alcohol use disorder.  R. at 507.

On October 5, 2017, four months after his release from prison in June 2017, Darden re-established his mental health treatment at the APT Foundation.  R. at 1139–40.  He reported or presented with the following symptoms:  depression, anxiety, difficulty sleeping, intrusive thoughts of traumatic events, recurrent nightmares, hypervigilance, excessive worry, low energy, and intermittent thoughts of hurting himself.  R. at 1140.  Darden sought to also re-establish individual psychotherapy but was advised that the APT Foundation only offered group therapy and medication management.  R. at 1151.

According to the treatment records, Darden was "pleasant" and cooperative; was able to focus and concentrate; had intact memory; had normal speech, thought processes, thought content, and perceptions; had fair judgment, with limited insight; and had no evidence of psychosis.  R. at 1142.  He was diagnosed with major depressive disorder and PTSD with a GAF score of 48,[4] as well as bipolar disorder.  R. at 1143, 1147.

Darden visited the APT Foundation again on October 10, 2017 and saw Amanda Shackell, APRN.  R. at 1145.  He described similar symptoms as his prior visit, including racing thoughts, little need for sleep, anhedonia, difficulty completing tasks, and paranoid thinking that "affects his ability to work with others."  *Id*.  According to a mental health examination, Darden

---

[3] According to the discharge summary, Darden had violated his probation for uncooperative behavior, unapproved use of social media, and refusing to allow his probation officer to enter his home for a home visit.  R. at 508.

[4] "GAF scores of 41 to 50 indicate serious symptoms or a serious impairment in social, occupational, or school functioning."  *Merancy v. Astrue*, 2012 WL 3727262, at *3 n.9 (D. Conn. May 3, 2012).  The GAF scale was removed from the fifth edition of the Diagnostic and Statistical Manual of Mental Disorders, which was published in 2013.  *Rock v. Colvin*, 628 F. App'x 1, 4 n.3 (2d Cir. 2015).

had a depressed mood, fair insight, and fair judgment.  R at 1146.  He was prescribed Geodon, Prazosin, and Trazodone.  R. at 1147.

On November 21, 2017, Nurse Shackell increased his dosage of Geodon.  R. at 1154. During their appointment, Darden indicated that the medications made him feel "a little better" but that he continued to feel "down" with recent suicidal thoughts.  R. at 1152.  Although his racing thoughts had slowed and his nightmares had improved, he continued to suffer from anxiety, anhedonia, problems with concentrating and completing tasks, and paranoid thinking. *Id*.  Darden was again observed to have a depressed mood and fair insight and judgment, as well as upset thought content.  R. at 1153–54.

During another appointment with Nurse Shackell on December 26, 2017, Darden reported that his anxiety and nightmares had improved since resuming medications one month ago, but that he was still feeling "down" due to a denial in his housing application.  R. at 1156–57.  He expressed some paranoia in public and racing thoughts, but noticed an improvement with the increase in Geodon with respect to those symptoms as well.  R. at 1156–57.  He stated that he still faced difficulty completing tasks and experienced periods of high energy and little sleep.  R. at 1156.

1. *Activities of Daily Living Report*

On December 16, 2015, Darden completed an Activities of Daily Living Report. R. at 226–33.  In the report, he indicated that he spent his days going to medical appointments and treatment programs.  R. at 226.  He noted that he did not need reminders to take care of his personal grooming; did not need assistance with taking medicine; prepared his own meals on a daily basis; and is able to do a variety of household chores.  R. at 227–29.  He listed reading, watching the television, playing videogames, and attending church as his hobbies.  R. at 230.

In response to the question of how often he goes outside, he wrote, "I try to go out every day." R. at 229. He also indicated that he talks on the phone, watches sports, and take walks daily; that he handles stress poorly; and that he has a feeling that someone is out to get him. R. at 231–32.

2. *Consultative Examination Report by Liese Franklin-Zitzkat, Psy.D.*

On March 1, 2016, Dr. Liese Franklin-Zitzkat, Psy.D., performed an evaluation of Darden at the Commissioner's request. R. at 395. Following her examination, Dr. Franklin-Zitzkat diagnosed Darden with PTSD, unspecified depressive disorder, rule-out persistent depressive disorder versus alcohol induced depression, and rule-out alcohol use disorder. R. at 398. No medical records were provided by DDS for her review. R. at 395.

As articulated in her report, Dr. Franklin-Zitzkat observed that Darden was cooperative, polite, alert, and oriented to person, place, time, and situation; that his thought processes were "logical" and "goal-directed," with no evidence of hallucinations or delusions; and that his judgment appeared "good." R. at 397. Although his long-term memory seemed "unimpaired," his short-term memory appeared "markedly impaired" and his concentration appeared "moderately to markedly impaired." *Id*. Dr. Franklin-Zitzkat judged his intellectual functioning to be in the "[a]verage or perhaps [l]ow [a]verage range." *Id.*

Dr. Franklin-Zitzkat opined that Darden was capable of attending to and understanding basic instructions but would likely have "marked difficulty" remembering instructions. R. at 398. She also opined that Darden would have "marked difficulty" sustaining concentration in a work setting because his "[s]hort term memory and concentration problems would interfere accordingly with his ability to carry out instructions." *Id*. She noted that his anxiety and depression could interfere with his ability to maintain attendance as well. *Id*.

Dr. Franklin-Zitzkat concluded that, depending on the work environment, Darden could have "marked difficulty" withstanding the stresses and pressures of a normal workday, particularly in a "[c]rowded, noisy environment." *Id*. She elaborated that Darden "should be able to adapt to changes insofar as the aforementioned problems do not interfere," and that he "seems capable of making straightforward kinds of decisions." *Id*.

3. *Opinion of Dr. Cory Sells*

On March 3, 2016, Dr. Cory Sells, a state agency psychologist, rendered an opinion on Darden's work capacity at the initial level. He did not examine Darden and formulated his opinion by reviewing various medical records, including Dr. Franklin-Zitzkat's report and Yale New Haven medical records. R. at 91–92. He opined, in relevant part, that Darden had "mild" restriction in his activities of daily living; "moderate" difficulties in maintaining social functioning; "moderate" difficulties in maintaining concentration, persistence, or pace; and experienced no repeated episodes of decompensation. R. at 96–97.

4. *Opinion of Dr. Russel Phillips*

On June 17, 2016, Dr. Russel Phillips, a state agency psychologist, rendered an opinion on Darden's work capacity at the reconsideration level. Like Dr. Sells, he did not examine Darden and instead based his opinion on the medical records, including the records from Hill Health and New Haven Primary Care as well as Dr. Franklin-Zitzkat's report. *See* R. at 104–05.

With respect to understanding and memory, Dr. Phillips found "not significantly limited" Darden's ability to remember locations and work-like procedures or his ability to understand or remember very short and simple instructions. R. at 111–12. Dr. Phillips opined that Darden's ability to understand and remember detailed instructions was "moderately limited," and that Darden had "sustained concentration and persistence limitations." *Id*. at 112.

With respect to concentration and persistence, Dr. Phillips found Darden "not significantly limited" in his ability to "perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances."  R. at 112.  His ability to:  (i) sustain an ordinary routine without special supervision; (ii) carry out very short and simple instructions; (iii) carry out detailed instructions; and (iv) make simple work-related decisions was likewise considered to be "not significantly limited."  *Id*.  By contrast, Darden was judged to be "moderately limited" in his ability to:  (i) maintain attention and concentration for extended periods and (ii) work in coordination with or in proximity to others without being distracted by them.  *Id*.  Darden's ability to complete a normal workday and workweek without interruptions from psychologically-based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods was opined to be "not significantly limited."  *Id*.

With respect to social interactions, Dr. Phillips determined that Darden's ability to interact appropriately with the general public, as well as his ability to accept instructions and respond appropriately to criticism from supervisors and to get along with coworkers or peers without distracting them or exhibiting behavioral extremes, was "moderately limited."  *Id*. at 112–13.  Darden's ability to ask simple questions or request assistance was found to be "not significantly limited," as was his ability to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness.  *Id*.

With respect to adaptation capabilities, Dr. Phillips concluded that Darden's ability to respond appropriately to changes in the work setting and to set realistic goals or make plans independently of others was "moderately limited."  *Id*.  Darden's ability to be aware of normal hazards and to take appropriate precautions, as well as his ability to travel in unfamiliar places or use public transportation, was also adjudged to be "moderately limited."  *Id*.

B. Procedural History

Darden applied for supplemental security income benefits on November 30, 2015,

asserting that he had been disabled with back problems since January 1, 2008.  R. at 119, 196–

204.  The SSA denied Darden's claim on March 4, 2016.  R. at 119.  Darden sought

reconsideration, but the SSA adhered to its decision.  R. at 127.  He thereafter requested a

hearing, which was held on March 9, 2018 before ALJ Deirdre Horton ("the ALJ").  R. at 33–73.

At the hearing, Darden was unaccompanied by a representative.  R. at 35.  When the ALJ

asked whether he was ready to proceed with the hearing without a representative, Darden

responded that he did not "have a choice."  *Id.*  The ALJ then inquired whether any records were

missing from the file, and Darden indicated that records from Hill Health dating back to January

2017 were missing, as were certain records from Yale-New Haven Hospital and Yale Primary

Care.  R. at 36.  Darden elaborated that he visits Hill Health weekly and that he also visits the

APT Foundation two to three times a week.  *Id.*  The ALJ stated that she would provide Darden

with release forms after the hearing so that she could obtain those records.  R. at 37.

During the hearing, Darden testified that he has not been able to hold a job since 2007

because of his paranoia.  R. at 41–42, 44.  He explained that it is challenging for him to work

with others because he believes people are "out to get" him—a mentality that he attributed to the

shootings in 1995 and 1997.  R. at 44–45.  He stated that he also suffers from anxiety and

depression, for which he takes medication.  R. at 45.  He clarified that Dr. Dudley at Hill Health

had been prescribing his medications until recently, and that a physician at the APT Foundation

is presently prescribing them.  *Id.*

He noted that he previously worked for a company by the name of Northeast Graphics

but was fired because he instigated a physical fight with his supervisor, who Darden thought was

13

attempting to "play with [his] head." *See* R. at 46.  According to Darden, he was fired from the next few jobs he held because of the "same issues."  R. at 47.

With respect to his daily activities, Darden testified that he lives with his mother and spends his days playing videos games and attending medical appointments and self-help group sessions.  R. at 50–51, 55.  He stated that he sees his girlfriend daily and that they go to the mall together on occasion, and that he does not go out as much as he used to due to his paranoia.  R. at 50–51, 56, 57.  He also noted that he had a history of drinking a six-pack of beer every other day, but that he stopped drinking alcohol approximately two years ago.  R. at 53.  Lastly, he testified that he has never attempted to commit suicide but that he thinks about suicide "all the time."  R. at 52.

The ALJ next heard testimony from Vocational Expert ("VE") Mr. King.  The ALJ asked King to consider a hypothetical individual with the following characteristics:  an individual of Darden's age, education, and work background who has no exertional limitations but is limited to simple, routine work and occasional interaction with others, and is restricted from working around the general public and from jobs that require collaboration or teamwork.  R. at 59.  The ALJ asked whether there are jobs in the national economy that such an individual could perform, and King responded that such individual would be able to perform the job of a dishwasher, janitor, and packer.  *Id*.

For the second hypothetical, the ALJ asked King to assume the same individual as in the first hypothetical, but to also assume that the individual is limited to light work.  R. at 59.  King stated that such an individual could perform the job of a garment sorter, mail sorter, and laundry worker.  R. at 59–60.

For the third hypothetical, the ALJ asked King to assume the same individual as in the first and second hypotheticals, but with the added limitation of being limited to frequent overhead reaching.  R. at 60.  King testified that such an individual could perform any of the medium or light jobs he had identified.  R. at 60.

For the fourth hypothetical, the ALJ asked King to consider the same individual as in the first hypothetical, but to also assume the individual is limited to occasional overhead reaching.  *Id*.  King responded that such an individual could perform the garment sorter, mail sorter, dish washer, janitor, and packer jobs, but not the job of a laundry worker.  *Id*.

For the fifth and final hypothetical, the ALJ asked King to consider the same individual as in the prior hypothetical, but to add the limitation that the individual would be off task.  The ALJ asked what amount of off-task behavior would be acceptable before the previously-identified jobs would be eliminated.  *Id*.  In response, King opined that an individual who was off task by ten percent or more would not be able to retain their job.  *Id*.

Darden subsequently asked how criminal history would factor into the analysis, and the ALJ responded that criminal history was not relevant to the inquiry at hand because it does not inform whether or not an individual could mentally or physically perform a job.  R. at 62, 63.  Darden then noted that several of the identified positions, including the janitor and packer positions, would entail working around people, and asked King whether jobs existed that would allow for no contact with others.  *See* R. at 63.  King responded that, although many jobs only required a minimal amount of social interaction, interaction with a supervisor was a prerequisite for any job.  *See* R. at 64–67.  For that reason, King explained, no job would permit zero social interaction.  *See* R. at 66–67.

C.  The ALJ's Decision

On May 29, 2018, the ALJ issued a decision concluding that Darden had not been disabled as of November 30, 2015 and denying benefits.  R. at 10–20.

At the first step of the five-prong inquiry, the ALJ found that Darden had not engaged in substantial gainful activity since November 30, 2015, the date of the application.  R. at 12.  At the second step, the ALJ determined that Darden's affective disorder, anxiety disorder, and alcohol abuse constituted severe impairments, but that his back pain did not.  R. at 12–13.

At the third step, the ALJ found that Darden's mental impairments were not *per se* disabling because they were not severe enough to meet the criteria of an impairment listed in 20 C.F.R. part 404, subpart P, Appendix 1.  *See* R. at 13.  Specifically, the ALJ concluded that Darden's impairments did not satisfy the "paragraph B" criteria of Listing 12.04 and 12.06, which requires that the mental impairments result in at least one extreme[5] or two marked[6] limitations in a broad area of functioning:  (i) understanding, remembering, or applying information; (ii) interacting with others; (iii) concentrating, persisting, or maintaining pace; and (iv) adapting or managing oneself.  R. at 13.  The ALJ instead determined that Darden only had "mild" limitations in understanding, remembering or applying information and in adapting or managing oneself.  R. at 13.  The ALJ also found that he only had "moderate" limitations in interacting with others and in concentrating, persisting, or maintaining pace.  *Id*.  The ALJ further concluded that Darden's impairments did not satisfy the "paragraph C" criteria, explaining that "[t]here is nothing in the record that indicates that [Darden] has ever lived in a highly structured setting or has exhibited marginal adjustment."  R. at 14.

---

[5] An "extreme" limitation means the claimant is unable to function independently, appropriately or effectively, and on a sustained basis, in that area.  R. at 13.

[6] A "marked" limitation means functioning independently, appropriately, effectively, and on a sustained basis in that area is seriously limited.  R. at 13

16

Before proceeding to the fourth step, the ALJ assessed Darden's residual functional capacity ("RFC") and determined that Darden could perform work at all exertional levels, with the following exceptions: he (1) is limited to simple, routine tasks; (2) can have only occasional interaction with others; (3) cannot complete tasks requiring collaboration, groups, or teams; and (4) cannot perform work with the general public. R. at 14. In reaching that conclusion, the ALJ reasoned that, although Darden's medically determinable impairments could reasonably be expected to cause the symptoms about which he testified, Darden's statements "concerning the intensity, persistence and limiting effect of these symptoms are not entirely consistent with the medical evidence and other evidence." R at 17. The ALJ elaborated that, in his Activities of Daily Living Report, Darden wrote that he had "no problems" performing certain activities and that he "attempted to go out every day," which, according to the ALJ, contracted his testimony that "he had stopped going out" as a result of his paranoia. *Id.*

The ALJ further noted that Darden reported periods of noncompliance during and after his incarceration in 2017, and that Darden "chose" not to access mental health services even when he "should have been aware" of his psychiatric impairments. R. at 17. She next discussed how Darden's testimony concerning his sobriety over the past two years was belied by the toxicology screens in November 2016 and December 2016, which tested positive for alcohol. R. at 17. She also weighed how Darden had violated the terms of his probation with "uncooperative behavior," which, according to the ALJ, underscored how Darden "was not doing everything possible to remain in the community and comply with his mental health treatment plan." R. at 18.

With respect to the opinion evidence, the ALJ accorded "little weight" to the opinion of Dr. Franklin-Zitzkat on the ground that it was "not supported by the medical evidence as a

whole." R. at 18. In particular, the ALJ discredited Dr. Franklin-Zitzkat's assessment that Darden would have "marked difficulty" remembering instructions and sustaining concentration in a work setting because other record evidence indicated that Darden had an intact memory and normal attention. *Id.* The ALJ similarly assigned "little weight" to the opinions of the state agency medical and psychological consultants at the initial level because they were "not based on the most recent medical evidence of record." *Id.* By contrast, the ALJ placed "great weight" on the opinions of the state agency medical and psychological consultants at the reconsideration level,[7] explaining that they were "supported by the medical evidence that was in the record at the time and that was subsequently received." *Id.*

At the fourth step, the ALJ found that Darden had no past relevant work. *Id.*

At the fifth and final step, the ALJ determined—based on Darden's residual functional capacity, age, education, work experience, and King's testimony—that the jobs that Darden could perform, which included dishwasher (medium, unskilled), janitor (medium, unskilled), packer (medium, unskilled), garment sorter (light, unskilled), mail sorter (light, unskilled), and laundry worker (light, unskilled), existed in significant numbers in the national economy. R. at 19–20. The ALJ therefore concluded that Darden was not disabled from November 30, 2015 through May 29, 2018, the date of the decision. *Id.*

The matter was thereafter appealed to the Appeals Council, and the Appeals Council denied the request for review on May 3, 2019. R. at 1–6.

---

[7] The ALJ did not name the specific consultants that she credited. Because the record only includes one state agency opinion that was furnished at the reconsideration level—Dr. Phillips' opinion—I assume that was the opinion to which the ALJ was referring.

**III.     Discussion**

On appeal, Darden argues that he is entitled to a new hearing.  *See generally* Mot., Doc.

No. 19.  Darden primarily contends that the ALJ erred by (1) failing to request medical opinions

on Darden's mental functioning from his treating providers at Hill Health and APT Foundation;

(2) according "great weight" to non-examining state agency medical consultants while assigning

"little weight" to the examining consultant; and (3) discrediting Darden's testimony about his

symptoms.  *Id*. at 1–12.  Darden also maintains that the ALJ was not properly appointed pursuant

to the appointments clause.  *Id*. at 12–16.

   A.   The ALJ Failed to Adequately Develop the Record.

Darden first argues that that ALJ erred by failing to request opinions on Darden's mental

functioning from his treating providers at Hill Health or the APT Foundation.  *See* Doc. No. 19,

at 3.  I agree, and for the reasons set forth below, conclude that the error was material and merits

remand.

In light of the non-adversarial nature of a benefits proceeding, the ALJ has an essential

duty to "investigate and develop the facts and develop the arguments both for and against the

granting of benefits."  *Vincent v. Comm'r of Soc. Sec*., 651 F.3d 299, 305 (2d Cir. 2011) (internal

citations omitted).  That duty is grounded in the Social Security regulations, which provide that

the Commissioner will "develop [the claimant's] medical history" and will "make every

reasonable effort to help [the claimant] get medical records from [its] own medical sources and

entities."  20 C.F.R. § 416.912(B).

It is well-established that the duty to develop the record is heightened when the claimant

is proceeding *pro se*.  *Moran v. Astrue*, 569 F.3d 108, 113 (2d Cir. 2009).  In that instance, the

ALJ is tasked with safeguarding the claimant's rights by "ensuring that all of the relevant facts

[are] sufficiently developed and considered" and by "scrupulously and conscientiously probing into, inquiring of, and exploring for all the relevant facts." *Id*. (internal citations and alterations omitted); *Lopez v. Sec'y of Dept. of HHS*, 728 F.2d 148, 149–50 (2d Cir. 1984) ("[T]he ALJ has a special duty to protect the rights of a pro se claimant. . . . When the ALJ fails to develop the record fully, he does not fulfill this duty and the claimant is deprived of a fair hearing."). Federal courts have a concomitant duty to "make a searching investigation of the record" to ensure that a *pro se* claimant's rights have not been infringed. *Moran*, 569 F.3d at 113 (citation omitted).

The duty to develop the treatment record is all the more important when it comes to treating physicians, and treating physicians' opinions in particular. The Social Security Administration recognizes a "'treating physician' rule of deference to the views of the physician who has engaged in the primary treatment of the claimant." *Burgess v. Astrue*, 537 F.3d 117, 128 (2d Cir. 2008) (internal citations omitted). According to the rule, the opinion of a claimant's treating physician is given "controlling weight" so long as it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the claimant's] case record." *Id.* (internal quotation marks and citations omitted). This level of deference is warranted because the "continuity of treatment" that a treating physician provides, and the doctor/patient relationship that results, offers the physician unique insight to make a "complete and accurate diagnosis." *See Petrie v. Astrue*, 412 F. App'x 401, 405 (2d Cir. 2011); 20 C.F.R. § 416.927(c)(2) ("[Treating] sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations.").

In light of the treating physician rule and the ALJ's obligation to develop the record, courts in this district have repeatedly concluded that the ALJ has a duty to request the opinions of a claimant's treating physicians.  *See, e.g., Hallett v. Astrue*, 2012 WL 4371241, at \*6–\*7 (D. Conn. Sept. 24, 2012) ("[I]t is not sufficient for the ALJ simply to secure raw data from the treating physician."); *Cortes v. Berryhill*, 2018 WL 1392903, at \*5 (D. Conn. Mar. 19, 2018) ("Given the information the ALJ had regarding Cortes's sessions with counselors at Catholic Charities, the ALJ erred by not requesting a treating physician opinion."); *Fabian v. Astrue*, 2007 WL 3355412, at \*4 (D. Conn. Nov. 13, 2007) ("[T]he combined force of the treating physician rule and of the duty to conduct a searching review requires that the ALJ make every reasonable effort to obtain not merely the medical records of the treating physician but also a report that sets forth the *opinion* of the treating physician as to the existence, the nature, and the severity of the claimed disability.") (emphasis in original).

The importance of a treating physician's opinion cannot be overstated in cases involving mental impairments.  As the Second Circuit has instructed, courts "should exercise an extra measure of caution when adjudicating the claims of a litigant whose mental capacity is in question."  *Chapman v. Choice Care Long Island Term Disability Plan*, 288 F.3d 506, 514 (2d Cir. 2002).  A psychiatric diagnosis is inherently subjective, and symptoms may fluctuate in their nature and intensity over a given period of time.  The question of how a mental impairment will manifest itself once the claimant transitions out of a structured, familiar environment and into a demanding, new workplace is therefore especially nuanced; a review of records alone, or a single examination of the claimant, will generally not provide an informed answer.  *See Rodriguez v. Astrue*, 2009 WL 637154, at \*26 (S.D.N.Y. Mar. 9, 2009) ("[A]n opinion of a treating psychiatrist is 'inherently more reliable than an opinion of a consultant based on a review of a

cold record because observation of the patient is critical to understanding the subjective nature of the patient's disease and in making a reasoned diagnosis.'") (citation omitted); *Schweers v. Berryhill*, 2020 WL 5518326, at *11 (S.D.N.Y. Sept. 14, 2020) ("[T]he longitudinal relationship between a mental health patient and [his or her] treating physicians provides the physician with a rich and nuanced understanding of the patient's health that cannot be readily achieved by a single consultative examination.") (citation omitted).

Each of foregoing principles squarely applies to this case.  Darden was proceeding *pro se*, the ALJ did not request the opinion of a treating physician, and the impairment at issue is psychiatric.  The ALJ therefore should have requested opinions from Darden's mental health treating providers.

Not only did the ALJ fail to request opinions from Darden's treating providers, but she also failed to advise Darden of his right to collect those opinions.  The ALJ's duty to develop the record, as well as elementary principles of fairness, obligate an ALJ to advise claimants—and particularly those who are proceeding *pro se*—of their right to request medical evidence, including opinions from his or her treating physicians.  *See Cabrera v. Astrue*, 2007 WL 2706276, at *8 (S.D.N.Y. Sept. 18, 2007) ("At the very least, the ALJ has an obligation to inform the claimant of the lack of documentation and of her right to subpoena medical records and reports on her own.").  The ALJ erred in that respect as well.

My inquiry, of course, does not end with a determination that the ALJ committed an error.  For the error to warrant remand, it must be material.  *See D'Agostino v. Berryhill*, 2020 WL 4218213, at *2 (D. Conn. July 23, 2020).  As the Second Circuit explained in *Tankisi,* "remand is not always required" if an ALJ fails to request medical opinions when "the record

contains sufficient evidence from which an ALJ can assess the petitioner's residual functional capacity." *Tankisi v. Comm'r of Soc. Sec.*, 521 F. App'x 29, 34 (2d Cir. 2013).

In this case, the ALJ's error was material because there was a dearth of evidence in the record related to the issue of Darden's residual functional capacity.  Unlike *Tankisi*, a case on which the Commissioner relies, the record here contained no assessment of Darden's mental limitations from any of his treating physicians.[8]  *Id.* at 34.  Moreover, the claimant in *Tankisi* argued that the ALJ erred by failing to seek an opinion from her treating physicians regarding whether she "could meet the *physical demands* at work."  *Id.* at 33 (emphasis added).  Here, by contrast, the focus of Darden's argument is that the ALJ erred by failing a request a treating source opinion pertaining to his mental limitations.  That distinction is significant because, as discussed above, opinions from treating providers are particularly instructive in assessing the residual functional capacity of a claimant with mental impairments.

Further, in this case, the medical opinions that did assess Darden's mental impairments were based on an incomplete record.  The opinions of the state agency medical and psychological consultants at the initial level were not premised on the most recent medical evidence of record; the ALJ properly accorded those opinions "little weight."  R. at 18.  The ALJ also discredited Dr. Franklin-Zitzkat's report, which was not based on any medical records.  R. at 395.  But Dr. Phillips' consultative opinion, which the ALJ did credit, was similarly defective.  That opinion was rendered in June 2016, nearly two years before the ALJ issued her decision in May 2018.  Accordingly, Dr. Phillips' analysis did not take into account any of the treatment notes from Darden's visits with Hill Health from July 2016 through March 2017 or with APT Foundation from October 2017 through January 2018.  That defect is material, because the

---

[8] Also significant, the claimant in *Tankisi* was represented.  *Id.* at 4 n.1.

record does not contain any other notes on Darden's mental functioning from a physician who had "a rich and nuanced" understanding of that functioning. *See Shweers*, 2020 WL 5518326, at *10. The record at the time of Dr. Phillips' review therefore reflected, at best, only superficial insight into Darden's mental health impairments and limitations.

The Commissioner counters that the failure to consider more recent treatment notes was not fatal to Dr. Phillips' opinion because Darden's condition did not worsen over time and perhaps even improved. Mot. to Affirm, Doc. No. 21-1, at 6–7. That argument is specious. Although recent records indicate that certain symptoms had "improved" following an increase in medication, the records also illustrate that many symptoms were unrelenting. For instance, the December 26, 2017 medical records to which the Commissioner cites note that Darden suffered from fleeting suicidal ideations and paranoid thinking, and that Darden was experiencing difficulty completing tasks, had nightmares twice a week, and was sleeping four hours a night. R. at 1156–57. Moreover, other records dated after June 2016 reported possibly significant changes in Darden's mental health, including a new diagnosis of bipolar disorder in October 5, 2017 and increases in medication over time.

Although the ALJ did have those records, as well as the Activities of Daily Living Report, at her disposal during her review, that fact does not render the error immaterial. Opinions, not treatment notes, are of particular import in evaluating claims arising out of psychiatric impairments. Indeed, although the treatment notes discuss Darden's "illnesses and suggest treatment for them," they "offer no insight into how [his] impairments affect or do not affect [his] ability to work, or [his] ability to undertake [his] activities of everyday life." *Guillen v. Berryhill*, 697 F. App'x 107, 109 (2d Cir. 2017).

The Commissioner's reliance on *Pellam v. Astrue*, 508 F. App'x 87 (2d Cir. 2013), is misplaced largely for that reason—that is, because that case concerned a physical rather than a mental impairment.  Moreover, unlike the claimant in *Pellam*, Darden was unrepresented at the hearing and did not have the benefit of counsel in assembling medical records.

At bottom, the record contains material gaps and insufficient information from which the ALJ could make an informed residual functional capacity finding.  For those reasons, remand is warranted for additional development of the record and procurement of treating source opinions pertaining to Darden's mental impairments.

## B.  Other Arguments

Because of the critical gaps in the record, I am unable to evaluate the merits of Darden's remaining arguments, including whether or not the decision is supported by substantial evidence. *See Schweers*, 2020 WL 5518326 at 12; *Lingley v. Saul*, 2020 WL 4499983, at *2 (D. Conn. Aug. 5, 2020) ("The Court does not reach the second stage of review – evaluating whether substantial evidence supports the ALJ's conclusion – if the Court determines that the ALJ failed to apply the law correctly.").  Indeed, "[w]here there is a reasonable basis for doubt whether the ALJ applied correct legal principles, application of the substantial evidence standard to uphold a finding of no disability creates an unacceptable risk that a claimant will be deprived of the right to have her disability determination made according to the correct legal principles."  *Johnson v. Bowen,* 817 F.2d 983, 986 (2d Cir. 1987).  Nonetheless, having reviewed the record and Darden's other arguments, and to offer additional guidance for remand, I briefly address Darden's contention that the ALJ improperly discredited his testimony about symptoms.

Social Security regulations outline a two-step process for evaluating a claimant's statements of symptoms.  *See Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010).  First, the ALJ

must assess whether there is "a medically determinable impairment that could reasonably be expected to produce the claimant's symptoms." *Cichocki v. Astrue*, 534 F. App'x 71, 75 (2d Cir. 2013). If the ALJ determines that the first step is satisfied, he or she must then evaluate the "intensity and persistence" of the claimant's symptoms in order to determine "the extent to which the claimant's symptoms limit the claimant's" capacity for work. *Id*. In undertaking that assessment, the ALJ must consider all of the available evidence, including objective medical evidence. *See id*. The ALJ, however, may not reject a claimant's subjective opinion regarding the intensity and persistence of the pain "solely because the available objective medical evidence does not substantiate [his or her] statements." 20 C.F.R. § 416.929(c)(2). Social Security Ruling 16-3P further instructs:

> [I]f the frequency or extent of the treatment sought by an individual is not comparable with the degree of the individual's subjective complaints, or if the individual fails to follow prescribed treatment that might improve symptoms, we may find the alleged intensity and persistence of an individual's symptoms are inconsistent with the overall evidence of record. We will not find an individual's symptoms inconsistent with the evidence in the record on this basis without considering possible reasons he or she may not comply with treatment or seek treatment consistent with the degree of his or her complaints.

*Soc. Sec. Ruling 16-3p Titles II & XVI: Evaluation of Symptoms in Disabilit*y Claims, SSR 16-3P (S.S.A. Oct. 25, 2017).

In the present case, the ALJ acknowledged that the impairments "could reasonably be expected to produce some degree of pain and functional limitations," but declined to fully credit Darden's descriptions regarding the degree of those symptoms and resulting limitations. R. at 17. In doing so, the ALJ weighed Darden's history of noncompliance with medication and noted how he "chose" not to seek out mental health services for certain periods of time. *Id*. It is not apparent from the record, however, whether the ALJ appropriately considered the reasons underlying Darden's failure to pursue or comply with psychiatric treatment, including the

possibility that his noncompliance may have resulted from the mental impairments themselves. *See Soc. Sec. Ruling 16-3p Titles II & XVI: Evaluation of Symptoms in Disability Claims*, SSR 16-3P (S.S.A. Oct. 25, 2017) (advising ALJs to consider the impact of mental limitations on an individual's treatment history); *accord Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581, 610 (1999) (Kennedy, J., concurring) ("It is a common phenomenon that a patient functions well with medication, yet, because of the mental illness itself, lacks the discipline or capacity to follow the regime the medication requires."). On remand, the ALJ should provide Darden with an opportunity to explain any lapses in pursuing or following medical treatment, and should weigh that explanation, along with any others apparent from the record, in her assessment.

The ALJ also considered Darden's conflicting accounts about his alcohol consumption and his parole violation in her evaluation of Darden's alleged symptoms. But collateral issues such as criminal behavior or the general tendency to be truthful have no bearing on the analysis at hand. *See Cortes v. Berryhill*, 2018 WL 1392903, at *9 (D. Conn. Mar. 19, 2018) ("the case law in this Circuit does not extend beyond the substance of the regulations and claimant's demeanor at the hearing"). As the recent regulatory guidance clarifies, "subjective symptom evaluation is not an examination of an individual's character. Instead, we will more closely follow our regulatory language regarding symptom evaluation." *Soc. Sec. Ruling 16-3p Titles II & XVI: Evaluation of Symptoms in Disability Claims*, SSR 16-3P (S.S.A. Oct. 25, 2017). Because I am remanding the case for further development of the record, I do not decide here whether the ALJ's assessment merits remand on this ground as well. On remand, however, the ALJ should reassess Darden's symptoms consistent with the foregoing principles and in light of any new relevant information. *Schweers*, 2020 WL 5518326, at *15.

**IV.**     **Conclusion**

For the reasons set forth, I **deny** the Commissioner's motion to affirm and **grant** Darden's motion to reverse to the extent that it asks that I vacate the decision of the Commissioner.  I remand for additional development of the record, including the procurement of treating source opinions regarding Darden's mental functioning, consistent with the foregoing reasoning.

The Clerk is directed to enter judgment in favor of Darden and close the case.   The Clerk is further instructed that, if any party subsequently appeals to this court the decision made after remand, that Social Security appeal shall be assigned to me (as the District Judge who issued the ruling that remanded the case).

So ordered.

Dated at Bridgeport, Connecticut, this 26th day of October 2020.

/s/ STEFAN R. UNDERHILL
Stefan R. Underhill
United States District Judge